0962

Cheryl GRAYSON, Employee, Appellant v. GULF OIL COMPANY, Employer, and Travelers Indemnity Company, Carrier, Respondents.

(357 S. E. (2d) 479)

Court of Appeals

*Hugo M. Spitz* and *J. Kevin Holmes*, of *Steinberg, Levkoff, Spitz, Goldberg, Pearlman, Holmes & White*, Charleston, *for appellant.*

*Robert A. Patterson* and *Bruce E. Miller*, of *Barnwell, Whaley, Patterson & Helms*, Charleston, *for respondents.*

Heard March 17, 1987.

Decided May 26, 1987.

GARDNER, Judge:

This is a worker's compensation case. The single hearing commissioner found as a matter of fact and concluded as a matter of law that the claimant (Cheryl Grayson) sustained an injury by accident arising out of and in the course of her employment which resulted in total disability from January 4, 1984, to the date of the order (June 4, 1985) and thereafter until maximum improvement has been reached or until further order, the employer to be given credit for the few days claimant worked in the interim. On appeal the full commission affirmed. But upon appeal to the Court of Common Pleas, the trial judge reversed the award on the grounds that there was no substantial evidence of record to support

the finding of accidental injury and that the claimant intentionally returned to her job knowing that she suffered from a reaction to petrochemicals and thereby intentionally injured herself. The claimant appeals. We reverse and remand.

The scope of review of the trial judge was and is defined by Section 1-23-380(g)(5), Code of Laws of South Carolina (1976), as amended. This statute provides that courts may reverse or modify administrative decisions if the pleadings are clearly erroneous in view of the substantial evidence on the whole record. Substantial evidence "is something less than the preponderance of the weight of the evidence; it is evidence which would allow a reasonable mind to reach the conclusion the administrative agency reached." *Ellis v. Spartan Mills*, 276 S. C. 216, 277 S. E. (2d) 590 (1981).

The claimant began working for Gulf Oil Company (the employer) in 1965. The claimant testified that between 1982 and 1983 substantial quantities of gas from storage tanks were lost by evaporation. According to the claimant's testimony, approximately 300,000 gallons of gasoline were lost. At the time the employer was having problems with the loading rack vapor recovery system.

The claimant, in the fall of 1982, began manifesting symptoms of what was later diagnosed as a dysfunction of her immune system caused by chemical sensitivity to gasoline products. In late October, 1983, the claimant became violently ill and was treated for the first time by Dr. Allan D. Lieberman who, the record reveals, is a qualified medical expert in ecology. In January, 1984, on Dr. Lieberman's advice, the claimant took sick leave for about a month. After that time, on Dr. Lieberman's advice, she decided to return to work because her symptoms and blood tests had returned to normal. She returned to work on February 12, 1984, and worked about four days when she became acutely ill. On February 17, 1984, she returned to her work office to talk with her immediate superior at which time she became deathly ill and was taken to the hospital by ambulance. She was treated by various doctors before returning to her specialist, Dr. Lieberman. Dr. Lieberman describes the claimant's illness in a letter of record to claimant's attorney dated August 14, 1984, as follows:

Mrs. Grayson has multi-system disease caused by chemical sensitivity. It would be best for your purposes to use the following diagnoses:

1. Environmentally triggered vasculitis syndrome manifesting:

    a) Arthralgia
    b) Myalgia
    c) Acneiform skin lesions of face, neck, chest

2. Allergic tension-fatigue syndrome manifesting:

    a) Fatigue
    b) Depression
    c) Confusion

All symptoms are second degree to petrochemical sensitivity.

From a practical point of view there is almost no place that a petrochemically sensitive person can work without being exposed adversely. This is because she reacts to all products derived from coal, oil, or gas. — i.e., carpeting, synthetic fabrics, copy machines, computer paper, vinyl wall coverings, etc. People in the work place are also a hazard because they are using colognes, after shave lotion, perfumes, and tobacco.

If Mrs. Grayson could live carefully in her own oasis and rotate her foods, she might regain tolerance to the petrochemical world in 1-2 years.

In my opinion the constant exposure over 19 years to the petrochemicals in her work place dysregulated her immune system resulting in an allergic or hypersensitivity cascade to her total environment including all foods, chemicals, and her own microbiological flora. (Emphasis ours.)

Dr. Lieberman, in the testimony of this case, described his connotation of the word "cascade" as follows:

And the reason I say that is that they undergo what we would use the terminology of cascade, where *suddenly* they become universal reactors, and they react to almost everything. (Emphasis ours.)

The only issue of merit is whether there is substantial evidence of record to show that the claimant's problem was

the result of an accident as used in these cases and as defined in Section 42-1-160, Code of Laws of South Carolina (1976), as amended, of the South Carolina Workers' Compensation Law.

The employer argues that claimant's disability is simply an occupational disease resulting from chronic exposure to petrochemicals over nineteen years and not the result of an accident as used in the law of workers' compensation.

Our courts have long held that the Workers' Compensation Law has to be construed liberally in favor of coverage, and doubtful cases should be resolved in favor of the injured employee. *Douglas v. Spartan Mills*, 245 S. C. 265, 140 S. E. (2d) 173 (1965).

The compensability of a particular event as an accident within the purview of the Workers' Compensation Law is a question of law to be decided by the courts. On the other hand, the commission's factual determination as to whether an accident has occurred is conclusive if supported by any competent evidence. *Sturkie v. Ballenger Corporation*, 268 S. C. 536, 235 S. E. (2d) 120 (1977).

The adjective "accidental" qualifies and describes the injuries contemplated by a statute as having the quality or condition of happening or coming by chance or without design, taking place unexpectedly or unintentionally.

The applicable rule on which this case turns is well stated in *Sturke:*

> A composite of South Carolina cases clearly establishes a recognition in South Carolina case law of diseases resulting from exposure constituting an injury by accident where the result is unexpected. An exacerbation of a pre-existing disease arising out of or in the course of the employment is compensable.

268 S. C. at 541, 235 S. E. (2d) at 122.

If one becomes ill while at work from natural causes, the state or condition is not accidental since it is a natural result of consequence and might be termed normal and to be expected. On the other hand, if there is a subsisting condition of illness or incapacity or physical disability which is caused, increased, or accelerated by some act or event coming by chance or happening fortuitously, then

the requisite quality or condition of the injury will exist so as to make it accidental. *Sturkie v. Ballenger Corporation, supra.*

The above rule is stated in 82 Am. Jur. (2d) *Workmen's Compensation* Section 303 (1976):

> Where a sudden illness or collapse is precipitated by the inhalation of harmful elements at a definite time, which brings to a climax the cumulative deleterious effects of the inhalation of such elements in the course of the employment over a period of time, it is generally considered that the disability is attributable to an accidental injury rather than to occupational disease.

The claimant in this case worked in an office adjoining gas tanks from which gas was loaded on trucks; she also worked at times around the loading tanks. From 1965 until 1983 the claimant worked for the employer. In 1982 the claimant, as previously noted, first began manifesting the symptoms leading to the "cascade" of the dysfunction of her immune system. The word cascade means in ordinary language to fall down — as the water in a waterfall does. Dr. Lieberman's connotation of the word is similar since it indicates a sudden collapse of the immune system.

During the year 1982 and up through the time that the claimant had to stop working, the vapor recovery system of the loading tanks adjacent to and where the claimant worked was defective. The purpose of a vapor recovery system is to take the fumes back into the storage tank as it loads the gas truck. During this period a massive amount of gasoline was lost — over 300,000 gallons. The claimant kept a daily record of the gasoline loss and it was massive. The employer spent thousands of dollars attempting to correct this huge loss of gas by vaporization. At the hearing before the single commissioner, the claimant attested to repair bills totalling more than $230,000.00.

On October 25, 1983, while the claimant was filling in for a workman on a loading rack, one of the maintenance men with a heavy odor of gasoline about him walked by her. She immediately gasped for breath, her eyes started running; her nose just totally stopped up; her throat stopped up; she couldn't talk; she testified that she could hardly move. We

hold that this was a cascade — a sudden event which brought to a climax the cumulative deleterious effects of the inhalation of petrochemical vapors in the course of the claimant's employment. It was, to say the least, an exacerbation of a preexisting condition arising out of and in the course of the claimant's employment by the employer. This was an accident within the meaning of the Act, and we so hold. From this point forward her condition deteriorated — it cascaded until November 10, 1983, when she was first treated by Dr. Lieberman. The exact moment of the total collapse of her immune system is, of course, unascertainable, but there is substantial evidence of record to support the finding of the Commissioner that by February 4, 1984, the claimant was totally disabled from the cascade.

We hold as a matter of law that there was a cascade as defined by Dr. Lieberman and that this was an accident within the meaning of workers' compensation law.

Having held as a matter of law that there was an accident as defined by the cited authorities, we also hold that there is clearly substantial evidence of record to support the findings of fact by the commissioner and the full commission.

And we summarily hold that the record does not support the appealed order's holding that the claimant intentionally injured herself by returning to work. The record is clear that she returned to work on the advice of her doctor. This holding by the appealed order is reversed.

For the reasons stated the appealed order is reversed and remanded with direction that judgment be entered for the claimant.

Reversed and remanded.

SHAW and BELL, JJ., concur.