## 21541

Charlees B. TULLER, Jr., Not Individually But as Nominee of the Trustees of Cousins Mortgage Equity and Investments, an Unincorporated Business Trust Organized Under the Laws of the State of Georgia, Respondent, v. NANTAHALA PARK COMPANY, Hilton Head Plantation Company, Inc., also known as Hilton Head Plantation Company; Citibank; and First National Bank of Chicago, of which Hilton Head Plantation Company, Inc., also known as Hilton Head Plantation Company, Citibank and First National Bank of Chicago are, Appellants.

(281 S. E. (2d) 474)

*McKay, Sherrill, Walker & Townsend,* Columbia, for *Hilton Head Plantation Co., Inc.*

*Roof & Cox,* Columbia, *for Citibank, et al.*

*Callison, Tighe & Rush* and *Nelson, Mullins, Grier & Scarborough,* Columbia, *for respondent.*

August 5, 1981.

LITTLEJOHN, Justice:

The issue presently before the court is the validity of a real estate mortgage given by defendant Hilton Head Plantation Co., Inc. (Hilton Head Co.) to plaintiff Cousins Mortgage Equity and Investments (Cousins)[1]. The Mortgage covers 58 acres on Hilton Head Island in Beaufort County, South Carolina.

A review of the facts is necessary to a discussion of the issues. In the early 1970's Sea Pines Co. and its two wholly-owned subsidiaries, Hilton Head Co. and Nantahala Park Co. (Nantahala), were land developers. Hilton Head Co. generally developed resort property on Hilton Head Island, while Nantahala was chiefly involved with resort development around Macon and Clay Counties in North Carolina.

About September, 1973, Nantahala began negotiations for a loan from Cousins to be used toward acquisition of development property in North Carolina. On October 16, 1973, the negotiations culminated in a $3.4 million loan. The full amount was not advanced by Cousins at that time. To secure the loan, Cousins was given a mortgage to approximately 7,000 acres of Nantahala's land in North Carolina, and Sea Pines guaranteed payment on the note. The negotiations also expressly anticipated the pledge of some of Hilton Head Co.'s property as additional security.

Several weeks later, on October 31, 1973, defendants Citibank and First National Bank of Chicago (collectively referred to as "Banks") entered into a revolving credit loan agreement with Hilton Head Co. This loan was basically a ten-year project for land acquisition by Hilton Head Co. in which it could borrow money from Banks not to exceed $64 million. To secure this debt, Hilton Head Co. gave the

---

[1] Cousins is an unincorporated business trust organized under Georgia law. This action was instituted on its behalf by Charles B. Tuller as nominee of Cousins' trustees.

Banks a mortgage to 3,300 acres of its property, and Sea Pines guaranteed payment. The 58 acre tract on Hilton Head Island was not included in the mortgage. The mortgage, which refers to the agreement, was duly recorded in Beaufort County.

In April, 1974, pursuant to the terms of the Nantahala-Cousins transaction, Hilton Head Co. gave Cousins the mortgage here in issue to a 58 acre tract (valued around $700,000) on Hilton Head Island. Cousins relied on this additional security in making further advances from the $3.4 million loan to Nantahala.

In latter 1974, the Banks, recognizing that the Sea Pines corporate family was incurring financial problems, began negotiations in an effort to protect its revolving credit loan without resorting to foreclosure. The discussions resulted in a pledge of all Hilton Head Co. stock to the Banks. Ultimately, the banks bought out Hilton Head Co. in its entirety in November, 1975, by acquiring all of its stock.

In February, 1976, Cousins commenced foreclosure proceedings to sell the mortgaged property in both North and South Carolina for payment on its outstanding debt of roughly $4 million. At the North Carolina foreclosure, Cousins acquired the 7,000 acre mortgaged property with a bid of about $2 million. Sea Pines was released as guarantor following payment of good consideration to Cousins. The remaining debt of approximately $2 million was reduced to roughly $1.3 million upon a showing that Cousins' bid of $2 million on the North Carolina property was more than $700,000 less than the fair market value of that property.

Cousins now seeks to foreclose its mortgage lien on the 58 acres on Hilton Head Island towards satisfaction of the remaining debt. Hilton Head Co. and the Banks answered

the foreclosure complaint and raised several defenses, as follows:

(1) The mortgage constitutes a fraudulent conveyance of the Banks, as creditors, under the Statute of Elizabeth (§ 27-23-10, *Code of Laws of South Carolina,* 1976);

(2) The mortgage violates § 33-13-170, 1976 Code, which prohibits certain corporate guaranties;

(3) Hilton Head Co. received no good consideration for the mortgage at a time when in fact it had a negative net worth;

(4) Cousins is barred from foreclosure of the South Carolina property because it made an election of remedies by initially foreclosing on the North Carolina property; and

(5) Cousins chilled the bidding in North Carolina by seeking an amount in excess of that owed.

The matter was heard by a special referee, who concluded that the mortgage constituted a fraudulent conveyance as to the Banks. All other defenses were decided in Cousins' favor. Exceptions were taken by all parties on appeal to the circuit court. The circuit judge reversed the special referee's finding that the mortgage constituted a fraudulent conveyance and ordered foreclosure. Hilton Head Co. and the Banks have appealed.

We treat first the basic issue on which the referee and the circuit judge disagreed: Was the mortgage from Hilton Head Co. to Cousins in April, 1974, a fraudulent conveyance within the terms of the Statute of Elizabeth, § 27-23-10 of the 1976 Code, and, did the lower court err in holding that the conveyance was not fraudulent?

Insofar as the appeal of Hilton Head Co. is concerned, we hold that this litigant has no standing to contest the validity of the mortgage it executed. Certainly, under no view can it be said that the mortgage was entered into for the purpose of defrauding Hilton Head Co. It can be force-

fully argued that the Banks, by acquiring all of the Hilton Head Co. stock, have no stronger rights, but the result we reach need not stand on this ground alone.

As relates to the appeal by the Banks, we are in █ agreement with the circuit judge, who held that the Banks were not entitled to have the mortgage declared invalid. The circuit judge correctly disposed of this issue. We adopt his discussion as the directive of this court:

Under South Carolina Law, the obtaining of a judgment and a *nulla bona return* is a condition precedent to bringing a suit to void a voluntary transfer as a fraudulent conveyance. Numerous cases have held that the right to attack a voluntary conveyance on the grounds of legal or unintentional fraud belongs solely to a pre-existing creditor and such creditor is required to reduce its debt to judgment and have execution issued and returned *nulla bona* before proceeding to void a transfer as a fraudulent conveyance. This requirement is based upon the usual rule that one invoking equitable remedies · must have exhausted his remedies at law. A full explanation of the history and application of the rule can be found in *Temple v. Montgomery,* 157 S. C. 85, 153 S. E. 640 (1929). This rule is clearly stated in *Temple*:

The law requires in an action by a creditor *solely* to set aside his debtor's *voluntary deed, for legal fraud,* allegation and proof that the debt was reduced to judgment, execution issued to enforce collection of the judgment, and a *nulla bona* return on the execution by the Sheriff.

In this case the banks have not met these essential requirements. There has been no action to reduce the debt owed to the banks to judgment, no execution and no *nulla bona* return on the execution. In his report the special referee relies on the case of *Penning v. Reid, et al.,* 167 S. C. 263, 166 S. E. 139 (1931). He concluded that under *Penning* the plaintiff's mortgage was a fraudulent conveyance. After reviewing *Penning* and other South Carolina cases,

I am satisfied that the special referee did not properly apply the law to the facts in this case.

Consistent with other cases in this state, *Penning* holds that for a creditor to prevail in an action to set aside a conveyance for legal fraud, he must obtain a judgment, execute a judgment, execute upon it and receive a *nulla bona* return from the sheriff.

The reason for this requirement is made clear in *Penning*: the liquidation of the debtor's property is conclusive on the issue of whether his assets will satisfy his debts. The creditor is entitled to have the conveyance set aside only if the debtor's property does not in the "final event" prove sufficient to pay his debts existing at the time of conveyance. The court summarized the rule in *Penning* as follows:

"One who is in debt, cannot make a voluntary conveyance, which will prevail against *existing* debts. The rule is thus stated in *Richardson v. Rhodus,* 14 Rich. 95 (we add italics): "The general rule is, that, *as against creditors existing at the time of the conveyance,* a voluntary conveyance is fraudulent in law and void. * * * The test of the donor's legal capacity to give, as against existing creditors, depends upon his *final* solvency"—that is to say, not upon his solvency at the time the gift is made; if *in the final event* the property of the debtor is not sufficient to pay his debts *existing at the time of his voluntary conveyance,* then such a conveyance is null and void as to such debts. (Emphasis added.)

The record in this case is clear that the banks accepted a transfer of all the corporate stock of Hilton Head Co. in lieu of instituting any collection action for the debt owed to them. They admittedly did this to avoid the market effect a foreclosure might have occasioned and so to protect the value of the island development.

While this may have reflected sound business judgment, it prevented the "final event" required by *Penning, Temple*

and their progeny. Without such a final event there is no way to say whether Hilton Head Co.'s assets would have satisfied its debts. I cannot indulge in speculation, as the banks would have me do, and assume the liquidation would not have produced enough cash to remove the debts.

In the usual case of a voluntary conveyance, setting it aside works no injury to the grantee, for he has normally parted with no consideration. In this case, plaintiff advanced some $1,100,000.00 on the basis of the security afforded by the now-questioned mortgage. With no absolute proof that Hilton Head Co.'s assets were insufficient in the *final event* to pay debts in existence on April 1, 1974, it would work a substantial injury to set aside plaintiff's mortgage. Such a case does not encourage relaxation of well-established requirements which are substantive and not procedural.

Moreover, there are other aspects of this case which suggest to me that voiding plaintiff's mortgage would not be equitable.

The revolving credit agreement prepared by the banks was secured by a mortgage of thousands of acres of real estate, which, significantly, did not include the property encumbered by the plaintiff's mortgage. Having consciously selected their collateral, and particularly since they have not foreclosed it, the banks should not now be able to reach other property once of Hilton Head Co. In the case of *First American Bank of Aurora v. Denney*, 53 Ill. App. (3d) 832, 11 Ill. Dec. 558, 368 N. E. (2d) 1304 (1977), the court held that a bank which had decided not to take a mortgage on particular real estate owned by the debtor could not thereafter assert that its transfer without consideration was a fraudulent conveyance. The holding in that case is consistent with my view of the law as it should apply to the facts here. Having selected its collateral, the banks may not now be heard to invoke the highly technical and economically disastrous results of the law of fraudulent conveyances

without first having assiduously observed all of the prerequisites to such relief. Equity requires a secured creditor to exhaust his collateral before attacking other transactions as fraudulent. 37 Am. Jur. (2d) *Fraudulent Conveyances* § 136.

Moreover, as noted earlier, the banks acquired all of the outstanding stock in Hilton Head Co. in lieu of instituting action to foreclose their security and collect their debt. Hilton Head Co., of course, cannot be heard in this or in any other action to say that the mortgage which *it* gave was a fraudulent conveyance. I am equally satisfied that the banks, which now own all of the stock in the corporation, stand in the same equitable shoes as the corporation for this purpose, and should not be allowed to disavow the mortgage.

All other issues submitted on this appeal come to this court with concurrent findings of fact and conclusions of law by the special referee and the judge. Such should not be disturbed unless unsupported by the evidence or contrary to the clear preponderance of the evidence. *Townes Associates, Ltd. v. City of Greenville,* 266 S. C. 81, 221 S. E. (2d) 773 (1976).

The Banks and Hilton Head Co. submit that both the referee and the trial judge erred in construing § 33-13-170 of our Code. That section reads as follows:

"§ 33-13-170. Loans to directors, officers, and shareholders.

(a) A corporation shall not directly or indirectly make any loan of money or property to, or guarantee the obligation of, (1) any director or officer or nominee of a director or officer of the corporation or of an affiliated, parent, or subsidiary corporation, or (2) any person or his nominee upon the security of the shares of the corporation or of an affiliated, parent or subsidiary corporation, except as provided by subsection (b).

(b) Such loan or guarantee may be made if it is approved by the vote or the written consent (1) of the holder or holders of all shares of the corporation, or (2) of the holders of at least two-thirds of the shares of all classes, whether voting or non-voting shares, excluding any shares held by the director, officer, or shareholder to be benefited by any such loan or guarantee, or by his nominee or any person under his control. No such loan or guarantee shall be made except upon adequate security at the rate of interest then prevailing for loans of like character."

This section is designed to prevent stockholders, directors, and a corporation itself from making loans to or guaranteeing obligations of its directors, officers and shareholders, or of the nominees of its directors, officers and shareholders. It does not prohibit a corporation from guaranteeing the obligation of a wholly-owned subsidiary corporation. The basic reason for the statute simply is not applicable under this factual situation.

We also agree that the conveyance is not fraudulent for lack of consideration. Cousins suffered a detriment by disbursing approximately $1,100,000.00 to Nantahala in reliance upon Hilton Head Co.'s mortgage, and Hilton Head Co. benefited by having its sister subsidiary, Nantahala, and its parent corporation, Sea Pines, placed in a better financial position. Consideration for a mortgage may consist of a loan to or the passing of benefits to a third person. *Greer Bank & Trust Co. v. Waldrop,* 155 S. C. 47, 151 S. E. 920 (1930); *Theodore v. Mozie,* 230 S. C. 216, 95 S. E. (2d) 173 (1956).

The Banks and Hilton Head Co. submit that Cousins' having elected to pursue the North Carolina security amounts to an election of remedies precluding a subsequent foreclosure on separate property in South Carolina in order to satisfy the remaining debt, that failure to procure a deficiency judgment in North Carolina prevents a subsequent foreclosure, and that Cousins chilled the bidding in North

Carolina by seeking an amount in excess of the amount due by Nantahala and should be estopped from pursuing the South Carolina security. Short of a showing of a fraudulent conveyance, the Banks have no right to be a party to this litigation. The Banks have no lien on the property involved. Until and unless the Banks foreclose their own mortgage and show that they have suffered a loss by reason of a deficiency judgment, there is no theory upon which they are entitled to proceed. Presumably, the Banks were permitted to intervene for the purpose of asserting a fraudulent conveyance. Having failed in this contention, they are no longer entitled to participate in the proceedig or interfere with Cousins' foreclosure action.

Neither can Hilton Head Co. prevail on these contentions. There was no election of remedies by proceeding first in North Carolina, since successive foreclosures may be maintained upon separate properties located in different states. 59 C. J. S. *Mortgages* § 489. And, even if Cousins chilled the bidding in the North Carolina foreclosure sale, the resulting damage was cured by reducing Cousins' debt by approximately $700,000 representing the difference between the amount Cousins paid for the North Carolina property at the foreclosure sale and the amount for which Cousins subsequently sold the property. *See: Symon v. Charleston Capital Corp.*, 242 So. (2d) 765 (Fla. App. 1970).

The contention that the interest on the indebtedness should be tolled after a reasonable period of time because the trial judge unusually delayed the rendering of his decision is without merit.

Payment of the special referee's fee needs clarification. It should be paid as follows: one-fourth by Cousins, one-fourth by Sea Pines, one-fourth by Hilton Head Co., and one-fourth by the Banks.

The order of the lower court is

Affirmed.

LEWIS, C. J., and NESS, GREGORY and HARWELL, JJ., concur.